UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| CONNELLY MANAGEMENT EMPLOYEE | ) | |
| WELFARE BENEFIT PLAN, on behalf of Itself) | | |
| and All Others Similarly Situated, | ) | |
|          Plaintiffs, | ) | |
| | ) | |
|    vs. | ) | 1:07-cv-0540-LJM-JMS |
| | ) | |
| NORTH AMERICAN INDEMNITY, N.V. | ) | |
|          Defendant. | ) | |

**FINDINGS OF FACT & CONCLUSIONS OF LAW AFTER COURT TRIAL**

On March 24, 2008, plaintiffs, Connelly Management Employee Welfare Benefit Plan ("Connelly" or "named plaintiff"), on behalf of itself and all others similarly situated ("class plaintiffs"), appeared with counsel, Mark Andrew Mason, and defendant, North American Indemnity N.V. ("NAI"), despite repeated and adequate notice of these proceedings, failed to appear for a Court Trial on the merits of class plaintiffs' claims under the Employee Retirement Income Security Act of 1972 ("ERISA"), 29 U.S.C. § 1132, *et seq.*  Having received evidence, the Court now enters the following Findings of Fact and Conclusions of Law:[1]

**I.  FINDINGS OF FACT**

1.     This lawsuit seeks money damages on behalf of a plaintiff class under the private action provision of ERISA, 29 U.S.C. § 1132.  By Orders of the U.S. District Court for the Southern

---

[1]Where appropriate or necessary, each of the following Findings of Fact shall be considered a Conclusion of Law, and each of the following Conclusions of Law shall be considered a Finding of Fact, or if a mixture of both fact and law, they shall be considered accordingly.

District of Texas (the "Houston Court") dated July 1, 2002 (Houston Docket Nos. 107, 112), and by Order of this Court dated December 13, 2007 (Docket No. 14), the Court granted Connelly's Motion for Class Certification as a Limited Fund Class under Federal Rule of Civil Procedure 23(b)(1)(B). The Court defined the class as:

> All employer ERISA plan sponsors that bought reinsurance through [NAI] after January 1, 2000, whose claims have not been paid by NAI.

2.     NAI is an insurer of ERISA welfare benefit plans adopted by approximately 409 employer ERISA plan sponsors.  Named plaintiff, Connelly, is an adequate representative of the class and its claims typify those of class members.  The evidence reflects that Connelly entered into a standard form Reinsurance Agreement with NAI and that the participants under the Connelly plan incurred many thousands of dollars in medical expenses adjudicated as valid and subject to plan coverage by the relevant third-party administrator, American Heartland Health Administrators, Inc. ("AHHA"), which NAI did not pay.  Holcomb Dep.; Trial Ex. 42.

3.     Furthermore, evidence adduced from the class of plan participants in the cause styled *McDaniel v. North American Indemnity, N.V.*, 1:02-cv-04222-LJM-JMS ("*McDaniel*"), tried at that same time as the instant cause, establishes that approximately 12,000 persons participated in the ERISA welfare benefit plans adopted by approximately 409 employer ERISA plan sponsors.  These plan participants incurred substantial medical expenses adjudicated as valid and subject to plan coverage by the third-party administrator, which NAI did not pay.  Trial Exs. 37 & 45; Trial Test. Dennis M. McDaniel; Trial Test. James Bush; Holcomb Dep.

4.     The claims of Connelly typify those of the other approximately 409 ERISA welfare benefit plans throughout the country insured by NAI and administered first by AHHA, and

2

subsequently by Managed Healthcare Inc. ("MHI") (collectively, the "TPA's").  George Aff. ¶ 2;

George Trial Test.  Class plaintiffs presented the testimony of Michael George ("George"), an

independent insurance agent associated with the Regit Inc. agency headquartered in Indianapolis,

Indiana.  According to George, approximately 200 of the welfare benefit plans within the ERISA

plan sponsor class definition were associated with Regit and he has personal knowledge of the matter

relating to those plans.  Geroge Trial Test.

     5.      In each instance, at the recommendation of AHHA, the employer-sponsors of the

plans entered into "Reinsurance Agreements" with NAI on behalf of the plans.  George Aff. ¶ 3;

George Trial Test.  Among the plans entering into these Reinsurance Agreements with NAI were

those of Connelly, Pedcor Management Co., Inc., M.L. Anderson Construction Inc. (plan sponsor

to named plaintiffs in *McDaniel*, James Bush and Karen Clark Bush), DVM Corporation d/b/a

Interstate Batteries (plan sponsor to named plaintiffs in *McDaniel*, Dennis and Vicki McDaniel) and

Blue River Medical Group PC (plan sponsor to named plaintiff in *McDaniel*, Linda Ann Perry).

Trial Exs. 1, 21B, Berry Dep. Ex. 1 (named *McDaniel* plaintiffs' Reinsurance Agreements).

     6.      The "Reinsurance Agreement" between NAI and each of the ERISA plan sponsors

that form the class in the instant cause was a "form" document containing identical or substantially

similar terms as among the named *McDaniel* plaintiffs' plans and the remainder of the approximately

409 class plans.  George Aff. ¶ 5 & Ex. A thereto; George Trial Test.  The "Reinsurance

Agreements" reflected that "the reinsurer has agreed to accept 100% of the reinsured's liability in

terms of the plan, except the first $\underline{0}$ of liability arising from the plan."  George Aff., Ex. A, Second

Recital.  In fact, the evidence reflects that NAI was not a legitimate reinsurer that provided stop-loss

or other coverage for insurers.  Rather, NAI established an unauthorized, unlicensed insurance business in the United States through the subterfuge of "reinsurance" of "self-funded" ERISA plans.[2]

7.      Although the plans purported to be "self-funded," in fact the purported "Reinsurance Agreements" between NAI and the plans reflect that NAI agreed to accept 100% of the liability under the plans.  As a matter of law under ERISA, the plans themselves were not in the business of insurance.  ERISA § 514(b)(2)(B) expressly states that ERISA welfare benefit plans are not in the business of insurance for purposes of any State law.  29 U.S.C. § 1144(b)(2)(B).  Because the plans themselves were not in the business of insurance, then, NAI was acting as the plans' insurer (albeit an unlicensed and unlawful insurer), and not as a "reinsurer" of insurance companies providing primary coverage to the plans.  *See Connelly Mgmt. Inc. v. McNicoll*, Civil Action No. 2:02-cv-2440-PMD-GCK, Findings & Concls., at 28-30 & n.38,  ¶ 43 (D.S.C. March 15, 2006) (Supp. Trial Ex. 1) (hereinafter "*Connelly Mgmt.* Opinion"); *see also Home Health Care Affiliates of Miss., Inc. v. Am. Heartland Health Adm'rs, Inc.*, No. 1:01-cv-00489-D-A, 2003 WL 24046753, at *6 (N.D. Miss. Mar. 21, 2003) (holding that NAI "labeling its coverage stop-loss or 'reinsurance' does not mask the reality that it is close to a simple purchase of group accident and sickness coverage.  Thus, it is not a legitimate stop-loss policy, but is more akin to insurance"); U.S. Dep't

---

[2]*See Connelly Mgmt. Inc. v. McNicoll*, Civil Action No. 2:02-cv-2440-PMD-GCK, Findings & Concls., at 28-30,  ¶ 43 (D.S.C. March 15, 2006) (hereinafter "*Connelly Mgmt.* Opinion"); Claro Dep. Exs. 465 (Indiana Commissioner of Insurance order that required NAI, Anderson and McNicoll to cease and desist their unauthorized business of insurance in Indiana), 483 (Colorado Division of Insurance cease and desist Order against NAI), 486 (Mississippi Insurance Department cease and desist notice against NAI's unauthorized business of insurance in Mississippi), 487 (Alabama Department of Insurance cease and desist order against NAI), 493 (Texas Commission of Insurance emergency cease and desist order against NAI, and its principals, who were also defendants in *McDaniel*, John Fowler Anderson ("Anderson"), and Euan D. McNicoll ("McNicoll")); *see also* Trial Exs. 31-35.

4

of Labor Advisory Opinions 2003-03A & 92-21(A) (finding that NAI and like "reinsurers" of self-funded ERISA plans are acting as insurers subject to regulations by the States) (Supp. Trial Ex. 6); Trial Exs. 31-35 (cease and desist orders against NAI from the states of Indiana, Colorado, Mississippi, Alabama, and Texas).  Hence, the Court agrees with the court in *Connelly Mgmt. Inc. v. McNicoll*, Civil Action No. 2:02-cv-2440-PMD-GCK, (D.S.C.) ("*Connelly Management* court"), the U.S. Department of Labor (Advisory opinions 2003-03A and 92-21A), and several States' commissioners of insurance that issued cease and desist orders against NAI, that NAI's "reinsurance" label was merely a subterfuge to avoid State-law regulation by the States' departments of insurance. As the Texas Department of Insurance, for example, recognized in issuing a cease and desist order against NAI, the "Reinsurance Agreements" reflected that NAI was acting as an unauthorized and unlicensed insurer and not as a "reinsurer" covering the obligations of other insurers after a specified attachment point.  *See* Trial Ex. 35; *see also* Trial Exs. 31-34.

8.      No doubt owing to the unlawful character of its business, NAI was formed by its co-defendants in *McDaniel*, John Fowler Anderson ("Anderson"), and Euan D. McNicoll ("McNicoll"), to be an "offshore" company that would maintain plan assets outside the territorial jurisdiction of the United States, in violation of ERISA § 404(b), 29 U.S.C. § 1104(b).  As the Court recognized in its August 14, 2007, Order granting the *McDaniel* plaintiffs' Renewed Motion for Certification of a Limited Fund Class, NAI was substantially undercapitalized by Anderson and McNicoll in relation to claims adjudicated valid by the TPA's under the "Reinsurance Agreements."  *McDaniel v. N. Am. Indemnity, N.V.*, Cause No. 1:02-cv-0422-LJM-JMS, Aug. 14, 2007, Order, at 4 ("*McDaniel* Aug. 14, 2007, Order").

9.     Under the plan documents, welfare benefit claims made by plan participants and beneficiaries were sent to the TPA's (first AHHA and later MHI) for a coverage adjudication. Horn Dep. at 16. Approved claims were then forwarded to NAI on a bi-monthly basis for payment. George Aff. ¶ 6; George Trial Test. NAI was then required by the "Reinsurance Agreements" to pay the class members' health care and prescription providers directly with a summary of payments and "Explanation of Benefits" form provided by the TPA's to the participants/beneficiaries. *Id.* In practice, throughout the period subject to the class definition, the TPA's collected money from the plans, took a 30% cut of the gross as an "administrative fee" and then sent the balance by wire transfer to NAI's offshore bank accounts in Brussels, Belgium, Luxembourg and Nassau, Bahamas. *Id.*; Horn Dep. at 38-40, 65-68, 81-83 ; Claro Dep. Vol. III, at 170; Vol. IV, at 572.

Specifically, with respect to maintenance of plan assets offshore by the NAI defendants, MHI's president, Edwin Horn ("Horn"), testified as follows:

Q.     And just so I am clear, the contributions were where you guys were suppose[d] to put the money that the employers were sending in every month?

A.     That is correct.

Q.     Alright.  What was suppose[d] to happen?  How was the money suppose[d] to flow from that account into the claims account?

A.     There was a board ruling established by [NAI] and by the Agreement that they had with the plan sponsor that said dollar amount[,] of percentage contribution amount[,] would go to administrative fees, too – and it[s] claims.  And what we would end up doing is we would take the contribution – their instruction was, the amount that would go to [NAI], that was shipped, transferred to whatever bank accounts that they set up.

Q.     In Belgium?

A.     In Belgium . . . ."

Horn Dep. at 81-83.  And, Mr. John Anthony Claro ("Claro"), an attorney who represented AHHA in proceedings in Texas, testified as follows:

> Q.      I will hand you what has been marked Plaintiffs' Exhibit 366.  The computer reflects an [AHHA] wire transfer of $792,434[.00] to the account of McSooner Inc. at Barclay's Bank in Nassau, Bahamas.
>
> A.      That sounds like another premium payment to me.  I don't know that I can identify this.  I know there were two premium payments sent to McSooner and later McSooner advanced them on to NAI's company account in Brussels. . . .
>
> Q.      And it's your testimony that those wire transfers were moved from the McSooner, Inc., account of NAI at KBC Bank in Brussels, Belgium?
>
> A.      Yes, I think.

Claro Dep. Vol. III, at 170.  Claro also testified:

> Q.      Okay, and then the premiums were effectively moved out of the reach of the U.S. employers before [NAI's] default.  In other words, they were not placed into an intermediary account, they were placed offshore, effectively out of reach of the U.S. employer at some time?
>
> A.      That's right. . . .

Claro Dep. Vol. IV, at 572.  *See also Connelly Mgmt.* Opinion, at ¶¶ 42, 97 & 106.

10.      On the basis of this and other exertions of control over plan assets by the NAI defendants, the Court's August 14, 2007, Order in *McDaniel* ("*McDaniel*, Aug. 14, 2007, Order") held that the NAI defendants are ERISA fiduciaries.  *McDaniel* Aug. 14, 2007, Order, at 1-2. Specifically "when Anderson and McNicoll wired plan assets offshore and in that fashion seized control of plan assets, they became subjected to personal responsibility as fiduciaries under ERISA." *Id.* at 2.  The NAI defendants caused these plan assets to be wired offshore in direct violation of ERISA § 404(b), which provides that "no fiduciary may maintain the indicia of ownership of any

assets of a plan outside the jurisdiction of the district courts of the United States." 29 U.S.C. §
1104(b).

11.     Beginning in August 2001 and at all times thereafter, NAI began refusing to pay
claims of the class members that had been adjudicated as valid and subject to coverage by the TPA's
(first AHHA and then MHI).  George Aff. ¶ 7; George Trial Test.  As George attested: "Since
August 2001, I believe NAI has not paid any claim in excess of $500 submitted by the
Regit-associated class plans and adjudicated as valid by the TPA's.  Since January 2002, NAI has
refused to pay claims of any size submitted by the class plans of which I am aware and adjudicated
as valid by the TPA's."  George Aff. ¶ 7.  The record reflects that NAI refused to pay the claims not
for any valid reason - all claims embraced by plaintiffs' class definition were determined to be valid
and subject to insurance coverage by the TPA's - but because Anderson and McNicoll wanted to
keep the money.  Horn Dep. at 32-33, 79-82, 89, 94; Claro Dep. Vol. III, at 342-345; Claro Dep. Vol.
IV, at 470, 472-73, 572-73.

MHI's President, Horn, testified:

Q.     What did [Anderson and McNicoll] tell you about funding claims
when you went to London?

A.     That they still had the intent to fund, that they were doing some audits
on the previous administrator, and that they were finding some weird things in their
minds, but that they were going to go ahead and fund the outstanding claims.

Q.     Did they do that?

A.     No.

Q.     When did that end?

A.     In this timeframe [sic] of mid-January 2002, they — they meaning Mr.
McNicoll and Mr. Anderson — contradicted an earlier commitment that they were

8

going to be sending – funding a number of claims runs that we had funding requests that we had – that we sent them.  And they were very clearly at this point said they're not going to process any more – pay any more claims until there is a complete audit of all the various plans.  At that point, we made a determination that we would communicate with the clients and let them know that, and which we did.

Horn Dep. at 79-80.  Horn also testified:

> Q.     Alright.  What about the already adjudicated but not funded claims above $500?
>
> A.     Those, to my knowledge, were still being researched and tried to be resolved at the I guess tenure of this relationship.
>
> Q.     Well, did [MHI] readjudicate those claims?
>
> A.     Yes.
>
> Q.     And present those to North American for payment?
>
> A.     Yes.
>
> Q.     But North American didn't pay them.
>
> A.     No.

Id. at 89.  Horn continued:

> Q.     Do you think [Anderson and McNicoll] ever had any intent of funding these claims after they came to [MHI]?
>
> A.     I had the express belief in their statements to not only ourselves but to every client that I was a party of a three way or other conversation, that they were going to fund and they were willing to upon proper documentation.
>
> Q.     When you look back on it now with the benefit of hindsight, what do you think?
>
> A.     I – I can only conclude that they didn't.

Id. at 94.

13.     Further, as AHHA's attorney, Claro, testified:

9

Q.      And it's [the plans'] fault if they get hooked up with a foreign reinsurance company who defrauds them, it's their fault?

A.      I don't know whether there is fraud in every instance, but there is the default and if you move offshore and you take a less well-established carrier that is unlicensed, that's more risky.  I mean, that's - everybody knows that.

Q.      Let's not mince words - there is fraud written all over NAI; isn't that correct?

A.      NAI, I agree with you.

* * *

Q.      So people are dying of cancer and going without health treatment and having their bills [left unpaid] because McNicoll is feeding his family off the money that is not being used to pay these claims?

A.      I say he was complicit in it and I think the man who was making the decisions is Anderson.

* * *

Q.      Anderson is involved in the [NAI] fraud from the beginning; isn't that correct?

A.      I think that is definitely true, yes.

* * *

Q.      And we know that McNicoll and Anderson stole the money because we know that it was $13, $14 million paid to them and they only paid, what, by your estimate $5, $6 million in claims?

A.      I have forgotten those figures.  I think it was a little bit more than that, but I sure think there are funds that are in their possession somewhere that are the fruit of their default here.

Claro Dep. Vol. III, at 342-43, 344-45.

13.      NAI's refusal to pay claims on a class-wide basis is also confirmed by George's

affidavit and testimony, as well as the affidavits and trial testimony of the *McDaniel* named

plaintiffs, who appeared at the contemporaneous presentation of evidence at the combined trial of

the issues in *McDaniel* and the issues of the instant cause.  George Aff. ¶ 7; McDaniel Aff. ¶  4;

Bush Aff. ¶ 4; Perry Aff. ¶ 3; George Trial Test.; McDaniel Trial Test.; Bush Trial Test.; Perry Dep.

As George attested, "NAI's refusal since August 2001 to pay welfare benefit claims adjudicated as

valid by the TPA [is] typical of that of the other class plans with which I am familiar."  George Aff.

¶ 7.

14.    The *Connelly Management* court's Findings of Fact are in accord with reference to

each of the approximately 409 plans that form the class in the instant case.  The *Connelly*

*Management* court expressly found that NAI's default was "pre-planned" and the culmination of a

decade-long scheme to sell unlawful insurance involving many of the same actors, including

McNicoll.  *See Connelly Mgmt.* Opinion, at ¶¶ 37, 40, 93, 114.  The Court adopts and incorporates

those findings herein by reference.  But, most specifically,

> the evidence established [that] . . . McNicoll [and] Anderson . . . executed an ERISA
> health insurance scam in the United States in which NAI, a fraudulent and
> undercapitalized Belgian reinsurance company, established as a front to perpetrate
> the repetitive ERISA health insurance scam, failed to pay over $10 million in medical
> claims of approximately 12,000 employees and their dependents who were covered
> under the fake health plan which was purchased by approximately 490 U.S.
> companies located throughout the United States. . . .  The ERISA health insurance
> scam, which was repetitively executed by essentially the same principal actors for
> approximately a decade resulted in tens of millions of dollars in unpaid medical
> claims incurred by the employees of small businesses in the U[nited] S[tates].

*Connelly Mgmt.* Opinion, ¶¶ 37, 40.  *See also id.* ¶ 47 ("The ERISA health insurance scam alleged

in Plaintiffs' Complaint has been repeated by the same principal actors for over a decade using

essentially the same structure.  A foreign reinsurance company is formed by the actors, often in

Belgium where regulation of reinsurance companies is "notoriously lax."  In almost every instance,

McNicoll was the individual that executed the reinsurance agreement on behalf of the foreign company. . . .   Premiums were collected through intermediaries, which are other companies formed by the principal actors, and then moved through backing channels established by the actors or thorugh foreign venues, such as Luxembourg, which have strict banking secrecy laws.").

In sum, this Court agrees with the *Connelly Management* court and concludes

that the justifications given by Anderson and McNicoll for NAI's non-payment of claims were contrived and not legally valid.  In fact, the refusal to pay plaintiffs' medical claims was motivated by the desire of Anderson, [and] McNicoll . . . to unlawfully make a large profit through actions specifically intended to injure plaintiffs by obtaining premium money from plaintiffs (as well as from other companies and their employees) through the use of NAI, a fraudulent, undercapitalized and unlicensed company which sold an unauthorized health insurance policy. . . .

*Connelly Mgmt.* Opinion, at ¶¶ 49, 107, 112  ("NAI simply kept (or stated bluntly, stole) the premiums and did not pay plaintiffs' claims.").

15.   NAI's refusal to pay claims adjudicated valid by the TPA's since August 2001 is further documented in an October 5, 2001, memorandum prepared by AHHA's Jack Ferguson ("Ferguson") and received by George at Regit in the normal course of business.  George Aff. ¶ 11 & Ex. E; George Trial Test.  As described in the Memorandum:

In August 2001, American Heartland presented its normal claims run on the 1st and 16th and was met with silence.  (Each of those claims runs was also in excess of the premium collected for the period.)  Finally, after repeated requests to NAI for funding, we received a letter from NAI dated September 19th informing us that they were going to withhold funding of all of the August claims and perform an 'audit' (as all of you are aware, those claims are still overdue today and NAI has yet to conduct its audit).  We have repeatedly requested that NAI provide specific information, on any specific claim, which it believes is incorrect, so it can be addressed . . . .  We were told that the total of the claims 'was too high!'

George Aff. Ex. E; George Trial Test.

16.     Subsequent to August 2001, AHHA's successor as third-party administrator, MHI, was likewise unable to secure payment of the adjudicated-valid claims by NAI.  George Aff.¶ 10; George Trial Test.; Horn Dep. at 32-33, 79-82, 89, 94.  Indeed, in letters dated March 5, 2002, and March 22, 2002, to the class plaintiffs, NAI acknowledged on a class-wide basis that it was refusing to pay claims adjudicated as valid by the TPA's.  George Aff. Exs. F & G ("North American Indemnity has suspended any further indemnity to the plans."); George Trial Test.  NAI asserted entitlement to over $4 million in additional payments from plan assets before it would pay any claims, even those already adjudicated as valid by the TPA's, thereby effectively impounding plan assets to which the class members are entitled.  George Aff. ¶ 12; *McDaniel* Aug. 14, 2007, Order, at 2 ("Therefore, when Anderson and McNicoll wired plan assets offshore and in that fashion seized control of plan assets, they became subjected to personal responsibility as fiduciaries under ERISA").

17.     While NAI's filing and subsequent failure to appear in this matter and failure to cooperate with discovery has impeded class plaintiffs' development of evidence respecting the total claims left unpaid by NAI, the best available evidence (for 283 of the 409 class plans) indicates $10,320,418.00 in adjudicated-valid but unpaid claims to class plaintiffs during the period subject to the class definition.  This total is based on the claims summary (itemized by plan and participant name) produced by defendant MHI prior to its bankruptcy in this matter.  Ex. 37.  This exhibit is authenticated by MHI Response to Request for Admission No. 1.  Ex. 27.

18.     As described in the Conclusions of Law below, § 409 of ERISA, 29 U.S.C. § 1109(a), measures damages for breach of fiduciary duty both in terms of contractual loss to the plans resulting from the breach (here, the $10,320,418.00 in unpaid claims) and disgorgement of any profit derived from the breach by the NAI defendants.  With respect to the ERISA employer plan sponsors whose

claims were adjudicated valid by AHHA, the best available evidence indicates that NAI made a profit of $5,077,336.00.  Claro Dep. Ex. 430; Claro Dep. Vol. IV, 472-73, 777-78; *Connelly Mgmt.* Opinion, at ¶ 112 ("According to AHHA records between September 2000 and October 31, 2001[,] NAI made a profit of $5,077,366.55 and claims as a percentage of premiums was 81.64%.").

19.     With respect to the ERISA employer plan sponsors who had claims adjudicated valid by MHI, the evidence indicates an additional profit of $4,674,116.00.  *See* MHI First Admissions ¶ 2, Bates Nos. MHI0005-0048, reports entitled "Employer Sponsored Plans Contributions Received" by MHI from October 2001 through at least February 26, 2002; Class Plaintiffs' Resp. to Defs.' Managed Healthcare Inc. and Edwin E. Horn's First Set of Interrogs. at 7, Ans. to Interrog. No. 1.  NAI's profit with respect to those ERISA employer plan sponsors whose claims were adjudicated valid by MHI is additionally reflected in documents produced by MHI entitled "Report All NAI Premiums Collections.XLS" and "NAI-Individual Group Disposition Report," as authenticated by MHI's Response to Class Plaintiffs Request for Admission No. 1.  Trial Exs. 27A; 37.

## II.  CONCLUSIONS OF LAW

1.     On December 21, 2001, NAI invoked and thereby subjected itself to the personal jurisdiction of this Court by its filing of this action in the U.S. District Court for the Southern District of Texas, then-styled as *North American Indemnity, N.V. v. American Heartland Health Administrators, Inc.*, Cause No. 4:01-cv-04477.  Houston Court Docket No. 1.  On May 14, 2002, the Houston Court dismissed NAI's claims against AHHA and on July 1, 2002, ordered that this case proceed as a class action to determine the claims of the intervening ERISA employer plan sponsors

against NAI.  Houston Court Docket Nos. 86, 107, 108.  On November 10, 2003, the venue of this action was transferred from the Houston Court to the U.S. District Court for the District of South Carolina, Charleston Division ("Charleston Court").  On April 27, 2007, the venue of this action was transferred from the Charleston Court to this Court.  On September 28, 2007, this case was consolidated for the presentation of common evidence at trial with the cause styled *McDaniel v. North American Indemnity, N.V.*, Cause No. 1:02-cv-0422-LJM-JMS ("*McDaniel*").  NAI failed to appear at the trial of this case, which NAI initiated.  It is axiomatic that a party that files an action in a court subjects itself to the personal jurisdiction of the court in regards to the proceedings.  NAI cannot invoke and then disregard the jurisdiction of this Court over these proceedings.

2.       NAI was formed for the purpose of doing business with ERISA plans in the United States.  NAI's directors, Anderson and McNicoll, traveled to the United States several times to conduct business.  NAI apparently collected premium payments in a United States bank account for some time.  NAI initiated this legal action in the United States.  This Court's personal jurisdiction over them does not offend the notions of substantial justice and fair play.

3.       Personal jurisdiction over NAI is also supported by a similar holding of the *Connelly Management* court with reference to the case Connelly filed against Anderson, McNicoll and others.  *Connelly Mgmt.* Order, ¶¶ 72-76.  This Court agrees with that analysis and adopts it by incorporation herein:

> The provision of the Reinsurance Agreement which states it would be 'construed and enforced according to the laws of the United States of America' constitutes an agreement or assent by McNicoll, Anderson and Reeve to submit any dispute arising out of the Reinsurance Agreement to the jurisdiction of a federal court in the United States.  The federal courts of the United States construe and enforce the laws of the United States in cases involving federal law.  28 U.S.C. § 1331.  The choice of the United States law provision used by McNicoll, Anderson and Reeve in the

15

Reinsurance Agreement, which was the instrumentality used to injure plaintiffs, amounts to an express agreement by McNicoll, Anderson and Reeve to submit to the jurisdiction of this Court. The choice of the United States law provision is an additional basis for this Court to exercise personal jurisdiction over said defendants as to plaintiffs' claims which arise out of the Reinsurance Agreement.

*Connelly Mgmt.* Order, ¶ 76.

4.      In addition to NAI having invoked the jurisdiction of this Court by the filing of this suit, the record reflects that, notwithstanding their failure to appear and defend in this matter, NAI has been served with all relevant papers filed herein by international, express mail. Ex. 39. Once again, all notions of fair play and substantial justice have been satisfied by these proceedings. Despite adequate notice, the NAI defendants unaccountably chose to ignore them.

5.      Class plaintiffs seek relief in relevant part for NAI's breaches of fiduciary duty under ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2). ERISA § 409(a) sets forth the standard of liability and measure of damages for breach of fiduciary duty:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, *and* to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary. . . .

29 U.S.C. § 1109(a) (emphasis added). ERISA § 502(a)(2) provides a private right of action "by a participant, beneficiary or fiduciary for appropriate relief under Section 1109 of this title" governing breaches of fiduciary duty. 29 U.S.C. § 1132(a)(2). *See, e.g.*, *Harzewski v. Guidant Corp.*, 489 F.3d 799, 804-805 (7th Cir. 2007) (stating that ERISA plan participants have standing under § 409 to seek money damages in the amount of contractual benefits owed as against breaching fiduciaries).

6.      ERISA was enacted to provide nationwide standards governing employee pension and welfare benefit plans for the protection of plan participants and beneficiaries. 29 U.S.C. § 1101(a).

16

It is the act's policy "to protect interstate commerce and interests of participants in employee benefit plans and their beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the federal courts." 29 U.S.C. § 1101(b).

7.      ERISA § 404(a) requires that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of providing benefits to participants and their beneficiaries. . . ." The fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ." The fiduciary must also act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter. . . ." 29 U.S.C. § 1104(a).

8.      ERISA § 404(a) provides, in pertinent part:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and . . . with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . .

29 U.S.C. § 1104(a). Thus, the duties of ERISA fiduciaries have been described as "the highest known to law," because they require those impressed with such duties to act "solely in the interest of plan participants and beneficiaries," for the "exclusive purpose" of providing benefits to them and as a prudent person would act under the circumstances. *Kuper v. Iovenko*, 66 F.3d 1447, 1452-58 (6th Cir. 1995); *Donovan v. Bierwirth*, 680 F.2d 263, 271-72 (2d Cir. 1982). The Seventh Circuit has

emphasized that the fiduciary duty imposed by ERISA "is far more exacting than the duty imposed by tort law not to mislead a stranger." *Harzewski*, 489 F.3d at 805-06.  In other words, the

> burden of proving fraud is heavier than that of proving a breach of fiduciary duty. . . .
> Such a breach might consist in imprudent management (for example, failure to
> diversify), mistake, self-dealing and other conflicts of interest, or failure to remedy
> breaches of a fiduciary duty by a co-fiduciary - all examples of misfeasance rather
> than malfeasance, involving no misrepresentations, and in short, falling short of
> fraud.

*Id.* at 805.

9.     Representing in part a codification of common law trust standards,[3] ERISA § 404(a) "embod[ies] a carefully tailored law of trusts, including the familiar requirements of undivided loyalty to beneficiaries, the prudent man rule, the rule requiring diversification of investments and the requirement that fiduciaries comply with the provisions of plan documents to the extent that they are not inconsistent with the Act." *Eaves v. Penn*, 587 F.2d 453, 457 (10th Cir. 1978).  In addition to the foregoing requirements, ERISA § 404(b) provides that "no fiduciary may maintain the indicia of ownership of any assets of a plan outside the jurisdiction of the district courts of the United States."  29 U.S.C. § 1104(b).

10.     ERISA fiduciaries have an affirmative duty to disclose material facts to plan participants.  "Fiduciaries must also communicate material facts affecting the interests of beneficiaries." *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir. 1993).  *See also*

---

[3]This point is confirmed by ERISA's legislative history.  "The principles of fiduciary conduct are adopted from existing trust law, but with modifications appropriate for employee benefit plans.  These salient principles place a two-fold duty on every fiduciary:  to act in his relationship to the plan's fund as a prudent man in a similar situation and under like conditions would act, and to act consistently with the principles of administering the trust for the exclusive purposes previously enumerated."  H.R. No. 93-533 (October 2, 1973), *as reprinted in* 1974 U.S.C.C.A.N. 4639, 4651.

*Rosen v. Hotel & Rest. Employees & Bartenders' Union*, 637 F.2d 592, 599-600 (3d Cir. 1981). "This duty exists when a beneficiary asks fiduciaries for information, and even when he or she does not." *Anweiler*, 3 F.3d at 991. *See also Harzewski*, 489 F.3d at 805-06 (stating that the ERISA fiduciary duty goes beyond a duty to avoid affirmative misrepresentation and embodies a "principle . . . far more exacting than the duty imposed by tort law not to mislead a stranger"); *Vescom Corp. v. Am. Heartland Health Adm'rs, Inc.*, 251 F.Supp.2d 950, 959-60 (D. Me. 2003) (holding that as an ERISA fiduciary, AHHA had an affirmative duty to speak so as to notify participants and beneficiaries of financial problems with Merrion Reinsurance Co., one of NAI's many bogus predecessors as the plans' "reinsurer").

11.     Exertion of control over plan assets vests the party having such control with fiduciary status. ERISA's definition of "fiduciary" in § 3(21)(A) states: "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets. . . ." 29 U.S.C. § 1002(21)(A)(i).  Consistent with the plain language of ERISA § 3(21)(A), case law makes clear that any control over plan assets, as for example check writing or other authority on bank accounts holding such assets, makes the party a fiduciary regardless of whether any "discretion" is involved. *See Coldesina v. Simper*, 407 F.3d 1126, 1132-34 (10th Cir. 2005); *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997).

12.     In its *McDaniel* August 14, 2007, Order that granted the *McDaniel* Class Plaintiffs' Motion for Determination of NAI Defendants' ERISA Fiduciary Duty, this Court cited *Coldesina* and *IT Corp.* with approval when it held that NAI is an ERISA fiduciaries. *McDaniel* Aug. 14, 2007, Order, at 1-2.

13.     Based on the foregoing Findings of Fact, the Court concludes that NAI has breached its fiduciary duties to the ERISA employer plan class plaintiffs in minimally the following ways:

- NAI operated an unlicensed and unauthorized business of insurance in the United States under the legal subterfuge of providing "reinsurance" to ERISA plans.  Findings of Fact ¶¶ 6-7.

- NAI caused plan assets to be wired and maintained outside the territorial jurisdiction of the United States in violation of ERISA § 404(b).  Findings of Fact ¶¶ 9-10.

- NAI was substantially undercapitalized by Anderson and McNicoll in relation to its adjudicated-valid claims obligations under the purported "Reinsurance Agreements."  Findings of Fact ¶ 8.

-  NAI perpetrated a pre-planned default in the payment of valid insurance claims to plaintiff and class members motivated by the self-dealing desire of Anderson and McNicoll to keep premium proceeds.  Findings of Fact ¶¶ 11-16.

- NAI attempted to perpetuate its unlawful insurance business by secretly negotiating to purchase the purportedly independent third-party administrator, Managed Healthcare, Inc., a material fact which was required to be, but was not, disclosed to plaintiffs and class members.  King Dep.; Ex. 88; *Connelly Mgmt.* Opinion, ¶¶ 78(m) & 111.

- Through its letters dated March 5, 2002, and March 22, 2002, to the class plans, NAI improperly attempted to extort over $4 million in additional,

retroactive "premium payments" from the plans to which NAI was not entitled under the plan documents. NAI stated that it would not pay any claims, even those already adjudicated as valid by the TPA's, unless this improper additional payment was made to Anderson and McNicoll. Findings of Fact ¶ 16.

•   At all times since August 2001, NAI failed to cure the foregoing breaches of fiduciary duty. NAI also failed to cure the breaches of fiduciary duty attributable to AHHA and MHI, as it was obligated to do by ERISA § 405(a), 29 U.S.C. § 1105(a).[4]

•   NAI additionally breached its fiduciary duty by failing to disclose the foregoing material facts to plaintiffs and class members. Instead, NAI concealed these facts so as to induce the class plans and participants to make further premium payments to NAI.

14.   Under ERISA § 409(a), once a breach of fiduciary duty is established, the Seventh Circuit has held that the burden shifts to the defendants to show that commingled trust assets are not "profits" subject to the conjunctively-stated disgorgement requirement of that section. *Leigh v. Engle*, 727 F.2d 113, 138-39 (7th Cir. 1984). Here, class plaintiffs have showed loss to the plans (i.e., the adjudicated-valid but unpaid benefit claims) in an amount of $10,320,418.00 resulting from NAI's breaches of fiduciary duty. Findings of Fact, ¶¶ 17-18. Under the cumulative damage

---

[4]ERISA § 405(a) provides that an ERISA fiduciary is subject to joint and several liability where the fiduciary knowingly participates in the breaches of another fiduciary, "knowing such act or omission is a breach" or "if he has knowledge of a reach by such other fiduciary unless he makes reasonable efforts in the circumstances to remedy the breach." 29 U.S.C. §§ 1105(a)(1) & (3).

provisions of § 409(a), NAI 's breaches entitle plaintiffs to that amount plus disgorgement of the breaching fiduciaries' profits. Because NAI has not even appeared to defend this matter, it perforce has failed to carry its burden under *Leigh* to show what, if any, portion of the assets received by NAI and not paid out in claims cannot be considered "profit" for purposes of § 409(a).

15. As described in Findings of Fact ¶ 18 above, the best evidence indicates that with respect to the ERISA employer plans sponsors with claims adjudicated as valid by AHHA, NAI profited in the amount of $5,077,336.00. With respect to the ERISA employer plan sponsors with claims adjudicated as valid by MHI, the evidence indicates an additional profit of $4,674,116.00. Findings of Fact ¶ 19. When disgorgement of these profits is added to the plans' loss under § 409(a), the Court concludes that plaintiffs and class members are entitled to judgment in the amount of $20,071,870.00 plus pre-judgment interest.

16. The Court recognizes that the two related cases before it, the cause styled *McDaniel v. North American Indemnity, N.V.*, Cause No. 1:02-cv-422-LJM-JMS, and the instant cause, involve claims on behalf of the participants and beneficiaries of the approximately 409 ERISA welfare benefit plans insured by NAI and the plans themselves, respectively. To the extent that the plans have already paid the claims of their participants and beneficiaries any recovery on the judgment entered herein redounds to the benefit of the plan. Conversely, to the extent that the participants' and beneficiaries' claims have not been paid by their plans, the participants and beneficiaries are entitled to recovery. If necessary, with the agreement of counsel for class plaintiffs, the Court may appoint a Special Master to supervise post-judgment claims proceedings determining the disbursement of recovered funds on a plan- and participant-specific basis. *See* 3 NEWBERG ON CLASS ACTION § 10:12, at 505-07 (4th Ed. 2002) (after judgment, "individual claims may be

processed by a special master or by a committee of counsel appointed by the [c]ourt. The drain on judicial resources is thus reduced and the processing of claims may be simplified because a lesser standard of proof may be applied without jeopardizing the defendant's due process rights, the defendant having been given full opportunity to challenge damages on a class basis at trial.")

17.    As prevailing parties, at the Court's discretion named plaintiffs and class plaintiffs may also receive an award of reasonable attorneys' fees and costs under § 502(g) of ERISA, 29 U.S.C. § 1132(g).  Counsel for class plaintiffs are directed to submit a fee application within thirty days of the entry of judgment for the Court's consideration.

18.    Class plaintiffs shall submit their petition for pre-judgment interest **before** Tuesday, April 15, 2008, so that the Court may enter judgment on April 15, 2008, that includes said pre-judgment interest amounts.

IT IS SO ORDERED this 8th day of April, 2008.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distributed electronically to:

Mark Andrew Mason
THE MASON LAW FIRM PA
mark@masonlawfirm.com

23